Nos. 22-16921, 22-16923

# In the United States Court of Appeals for the Ninth Circuit

IN RE: GOOGLE PLAY STORE SIMULATED
CASINO-STYLE GAMES LITIGATION

JENNIFER ANDREWS, ET AL.,

*Plaintiffs-Appellees/Cross-Appellants,*

v.

GOOGLE LLC, ET AL.,

*Defendants-Appellants/Cross-Appellees.*

*ON CROSS-APPEALS FROM THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA
NO. 5:21-MD-03001
HON. EDWARD J. DAVILA, PRESIDING*

## OPENING BRIEF OF DEFENDANTS-APPELLANTS GOOGLE LLC AND GOOGLE PAYMENT CORP.

LAUREN GALLO WHITE
 Wilson Sonsini
 Goodrich & Rosati, P.C.
 139 Townsend St. Ste. 150
 San Francisco, CA 94107
 (415) 471-3940

SAMANTHA MACHOCK
 Wilson Sonsini
 Goodrich & Rosati, P.C.
 12235 El Camino Real
 San Diego, CA 92130
 (858) 350-2300

BRIAN M. WILLEN
 Wilson Sonsini
 Goodrich & Rosati, P.C.
 1301 Sixth Ave, 40th Floor
 New York, NY 10019
 (212) 999-5800

PAUL N. HAROLD
KELSEY J. CURTIS
 Wilson Sonsini
 Goodrich & Rosati, P.C.
 1700 K Street N.W.
 Washington, DC 20006
 (202) 973-8800

*Counsel for Defendants-Appellants/Cross-Appellees
Google LLC and Google Payment Corp.*
**Additional Counsel Listed On Signature Page**

# CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1, Defendants-Appellants/Cross-Appellees state as follows:

Google LLC is a subsidiary of XXVI Holdings Inc., which is a subsidiary of Alphabet Inc., a publicly traded company; no publicly traded company holds 10% or more of Alphabet Inc.'s stock.

Google Payment Corp. is a subsidiary of Google LLC. Google LLC is a subsidiary of XXVI Holdings Inc., which is a subsidiary of Alphabet Inc., a publicly traded company; no publicly traded company holds 10% or more of Alphabet Inc.'s stock.

/s/ *Brian M. Willen*

Brian M. Willen
*Counsel for Defendants-Appellants/Cross-Appellees, Google LLC and Google Payment Corp.*

i

# TABLE OF CONTENTS

**Page**

CORPORATE DISCLOSURE STATEMENT ........................................................i

TABLE OF CONTENTS........................................................................ ii

TABLE OF AUTHORITIES ................................................................iv

INTRODUCTION ...................................................................................1

JURISDICTION.....................................................................................1

ISSUES PRESENTED...........................................................................2

STATEMENT OF THE CASE..............................................................2

    A.    Factual Background..............................................................2

        1.    The Google Play Store ...............................................2

        2.    The Social Casino Apps.............................................4

        3.    Google's Alleged Role in Facilitating Allegedly Illegal Gambling on the Social Casino Apps ..........................................6

    B.    Procedural History................................................................8

        1.    Plaintiffs' Claims Are Centralized In An MDL. ........................8

        2.    Plaintiffs File A Master Complaint And Google Moves To Dismiss. ...........................................................9

        3.    The District Court Divides Plaintiffs' Allegations Into Three Theories, Concludes That Section 230 Bars Two, And Certifies Its Order For Interlocutory Appeal. ..................10

SUMMARY OF ARGUMENT .............................................................13

STANDARD OF REVIEW ..................................................................17

ARGUMENT ........................................................................................18

I.    Section 230 Protects Interactive Computer Service Providers Like Google From Claims Seeking To Hold Them Liable For Third-Party Content Like Social Casino Apps............................................18

II.    Having Correctly Found That Section 230 Barred Plaintiff's Hosting, Promotion, and Marketing Allegations, The District Court Erred In Applying Section 230 To Payment-Processing Allegations That Were Never Alleged To Form An Independent Basis For Liability......................21

III. The District Court Erred In Holding That Section 230 Does Not Preempt Plaintiffs' Payment-Processing Allegations .................................... 25

    A. Section 230 Protects Processing Payments For Publishing. .............. 26

    B. Plaintiffs' Payment-Processing Allegations Seek To Hold Google Liable For Facilitating the Creation And Use Of Allegedly Illegal Third-Party Content Online .................................... 28

    C. Because Plaintiffs' Claims Depend On Allegedly Unlawful User Content, They Are Fundamentally Different From The Claims Asserted In *HomeAway* And *Gonzalez*. ................................. 32

    D. Allowing Creative Pleading To Isolate Payment Processing Would Undermine Section 230's Purposes ........................................ 35

CONCLUSION ................................................................................................ 37

STATEMENT OF RELATED CASES ................................................................. 38

CERTIFICATE OF COMPLIANCE ..................................................................... 39

CERTIFICATE OF SERVICE .............................................................................. 40

iii

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Barnes v. Yahoo!, Inc.*,
570 F.3d 1096 (9th Cir. 2009) ............................................... 10, 13, 14, 19, 20-26

*Batzel v. Smith*,
333 F.3d 1018 (9th Cir. 2003) ............................................. 18-20, 23, 26, 27, 35

*Blumenthal v. Drudge*,
992 F. Supp. 44 (D.D.C. 1998) ..........................................................................27

*Carafano v. Metrosplash.com, Inc.*,
339 F.3d 1119 (9th Cir. 2003) ......................................................18, 21, 26

*Cubby, Inc. v. CompuServe, Inc.*,
776 F. Supp. 135 (S.D.N.Y. 1991) ..................................................................35

*Disability Rts. Mont., Inc. v. Batista*,
930 F.3d 1090 (9th Cir. 2019) ..........................................................................17

*Doe v. Internet Brands, Inc.*,
824 F.3d 846 (9th Cir. 2016) .............................................................................18

*Dyroff v. Ultimate Software Grp., Inc.*,
934 F.3d 1093 (9th Cir. 2019) ..................................................11, 18, 20, 23, 33

*Fair Hous. Council of San Fernando Valley v. Roommates.com, LLC*,
521 F.3d 1157 (9th Cir. 2008) ....................................... 14, 19-22, 26, 30, 31, 36

*Fed. Agency of News LLC v. Facebook, Inc.*,
432 F. Supp. 3d 1107 (N.D. Cal. 2020) ............................................................27

*Force v. Facebook, Inc.*,
934 F.3d 53 (2d Cir. 2019) ................................................................................20

*Free Kick Master LLC v. Apple Inc.*,
140 F. Supp. 3d 975 (N.D. Cal. 2015) ..............................................................19

*Fyk v. Facebook, Inc.*,
808 F. App'x 597 (9th Cir. 2020) ......................................................................27

iv

*Goddard v. Google, Inc.*,
   2008 WL 5245490 (N.D. Cal. Dec. 17, 2008)....................................................27

*Gonzalez v. Google LLC*,
   2 F.4th 871 (9th Cir. 2021) ....................................... 11, 16, 18, 20, 21, 32-34, 36

*Gonzalez v. Google LLC*,
   143 S. Ct. 1191 (2023)........................................................................................21

*Hinton v. Amazon.com.DEDC, LLC*,
   72 F. Supp. 3d 685 (S.D. Miss. 2014) ...............................................................27

*HomeAway.com, Inc. v. City of Santa Monica*,
   918 F.3d 676 (9th Cir. 2019) .................................................................. 16, 32-35

*Jones v. Bock*,
   549 U.S. 199 (2007)...........................................................................................18

*Jones v. Dirty World Entm't Recordings LLC*,
   755 F.3d 398 (6th Cir. 2014) .............................................................................21

*Kater v. Churchill Downs Inc.*,
   886 F.3d 784 (9th Cir. 2018) ...............................................................................6

*Kimzey v. Yelp! Inc.*,
   836 F.3d 1263 (9th Cir. 2016) ............................................... 16, 20, 23-27, 29

*M.A. ex rel. P.K. v. Vill. Voice Media Holdings, LLC*,
   809 F. Supp. 2d 1041 (E.D. Mo. 2011) .............................................................27

*In re MasterCard Int'l Inc.*,
   313 F.3d 257 (5th Cir. 2002) .............................................................................24

*Olympic Forest Coal. v. Coast Seafoods Co.*,
   884 F.3d 901 (9th Cir. 2018) .............................................................................17

*Perfect 10, Inc. v. CCBill LLC*,
   488 F.3d 1102 (9th Cir. 2007) ...............................................................20, 27, 28

*Reuter v. MasterCard Int'l, Inc.*,
   921 N.E.2d 1205 (Ill. App. Ct. 2010) ................................................................24

v

*Rigsby v. GoDaddy Inc.*,
  59 F.4th 998 (9th Cir. 2023) ................................................................27

*Twitter, Inc. v. Taamneh*,
  143 S. Ct. 1206 (2023)........................................................................34

*Whitaker v. Tesla Motors, Inc.*,
  985 F.3d 1173 (9th Cir. 2021) ............................................................17

*Zeran v. America Online, Inc.*,
  129 F.3d 327 (4th Cir. 1997) ..............................................................35

**Statutes**

28 U.S.C. § 1292(b) ...........................................................................2, 12

28 U.S.C. § 1331 ....................................................................................1

28 U.S.C. § 1332(d) ...............................................................................1

28 U.S.C. § 1367 ....................................................................................1

47 U.S.C. § 230..............................................................................*passim*

**Other Authorities**

Webster's Third New International Dictionary
  (Philip Babcock Gove ed., 1986).......................................................26

**INTRODUCTION**

Section 230 of the Communications Decency Act ("Section 230") shields Google and other online platforms from liability for claims based on their role in publishing content created by third parties, including third-party application ("app") developers. While the district court correctly applied the immunity in most respects, it erred in endorsing Plaintiffs' effort to plead around Section 230 with allegations that Google provides payment-processing infrastructure that allows app developers to create and sell virtual content within apps published on the Google Play store. Appreciating that "reasonable minds could differ" on the point (1-ER-37), the district court *sua sponte* certified its order for interlocutory appeal. This Court should reverse and hold that Plaintiffs' claims—which inescapably seek to hold Google liable for content on third-party apps that allegedly violates state gambling laws—are barred by Section 230.

**JURISDICTION**

The district court has jurisdiction over this case under 28 U.S.C. § 1332(d) because the putative class satisfies the Class Action Fairness Act's minimal-diversity requirement and alleges claims that seek more than $5 million. The district court also has federal-question jurisdiction under 28 U.S.C. § 1331 because the complaint alleges violations of the Racketeer Influenced and Corrupt Organizations ("RICO") Act, and supplemental jurisdiction under 28 U.S.C. § 1367 over the state-law claims.

This Court has jurisdiction over this appeal under 28 U.S.C. § 1292(b). On September 2, 2022, the district court certified for interlocutory appeal its order granting in part and denying in part Google's motion to dismiss. On September 12, 2022, Google timely petitioned this Court for permission to appeal; and on December 8, 2022, the Court granted Google's petition.

## ISSUES PRESENTED

Whether Section 230, 47 U.S.C. § 230(c)(1), bars Plaintiffs' claims, which seek to hold Google liable for allegedly unlawful third-party apps published on the Google Play store. In particular, this Section 1292(b) appeal asks whether an app-publishing platform loses Section 230 protection if it provides online payment-processing infrastructure that allows third-party app developers to create and sell virtual content that may be used to engage in allegedly illegal gambling within third-party apps.

## STATEMENT OF THE CASE

**A.    Factual Background**

**1.    The Google Play Store**

Google owns and operates the Google Play store, which publishes and allows users to download a vast array of mobile apps to phones and tablets that run on the Android operating system. 2-ER-235–36. App developers submit their completed apps, and Google reviews, lists, hosts, and makes those apps available on the Google Play store. 2-ER-243. Millions of different apps are available, and to help users find

2

what they are looking for, Google organizes the apps into various categories. One category is "Games," which is further organized into sub-categories such as "Card," "Arcade," or "Casino." 2-ER-243. In this case, Plaintiffs allege that certain apps available on the Google Play store—which they refer to as "Social Casino Apps"—provide illegal gambling services and that "Google has not taken steps to limit access to" these "Casino" games. 2-ER-243, 246.

Google publishes apps in the Google Play store pursuant to its publicly available content policies. As the complaint alleges, these policies "demand[] that apps comply with all relevant laws within the jurisdiction where the app is available." 2-ER-243. Google instructs that any advertising created by third parties for Social Casino Apps "should not appeal to minors." 2-ER-244. The Google Play store also applies "content ratings for all apps" to inform users of "potentially objectionable content." 2-ER-243–44.

All app developers who place their apps on the Google Play store are provided the same set of tools, including (1) analytics tools to help developers understand how their apps are downloaded and used; (2) "App Campaigns" to help developers design their advertising to best market and publicize their apps; and (3) other media strategy tools that include various "promotional activities," such as "offering coupons [and] credits." 2-ER-238–39, 244–45; *see also* 2-ER-221–25. Through these various tools, Plaintiffs assert that Google aids in "the design and direction of targeted

3

advertising," which allegedly allows the Social Casino Apps to better attract and keep users. 2-ER-245.

To any third-party app developers that choose to sell virtual content for consumers to buy through their apps—whether game avatars or, here, virtual chips—Google also provides "payment processing" services to facilitate those third-party content purchases. 2-ER-231, 239–40, 245; *see also* 2-ER-218–20, 230. In the case of Social Casino Apps, Plaintiffs allege that "Google operates as the payment processor for all in-app purchases of virtual chips," which app users can use only within the app, and that Google retains a 30% commission for all payments it processes. 2-ER-232, 237; *see also* 2-ER-245–46 ("Google's payment system … process[es] all *in-game* purchases." (emphasis added)); 2-ER-308–09 ("[Google] process[es] all *in-app transactions*." (emphasis added)).

## 2. The Social Casino Apps

Plaintiffs allege that various third-party Social Casino Apps are available for download from the Google Play store. *See, e.g.*, 2-ER-236, 238–39. The "initial download of the game is free." 2-ER-229 n.2. After downloading the game, players "access" the games online "through mobile apps" using the Android operating system. 2-ER-236.

According to Plaintiffs' allegations, the Social Casino Apps allow users to play versions of traditional casino games like slot machines, card games, and bingo.

2-ER-236. Players use virtual chips offered within the app environment to play these games. The apps provide an "initial allotment of virtual chips for free." 2-ER-236. If a player runs out of virtual chips, players can "wait for some period of time before receiving more free chips" or "purchase virtual 'chips' in exchange for real money." 2-ER-229, 237. The chips are created and sold by the app developers. 2-ER-229, 237. And like the apps themselves, these chips are a form of online content, similar to a game player's avatar or the clothes or weapons a virtual character might use within a digital game.

There is also an important difference between these stylized virtual chips and the chips a real-world player might purchase in an actual casino: the virtual chips cannot be "cash[ed] out"; they can be used only to play games within the specific Social Casino App or to "gift" to other players using that app. 2-ER-229, 237. A player who pays $10 to purchase 100 virtual chips, which are then used to win 100 more chips, cannot redeem the 200 chips for $20. Once the chips are purchased, the money is spent. Accordingly, like scrip at a county fair or tokens at an arcade—the chips have value only within the particular environment where they are purchased, and they can be used within that environment for a variety of purposes (including to play different games).

Plaintiffs' complaint makes clear that the "social casino companies"—not Google—create and sell the virtual chips. 2-ER-229–30 & n.2, 237, 309. Plaintiffs

allege that third-party app developers created the Social Casino Apps and all of the allegedly objectionable content within them. *See, e.g.*, 2-ER-243 (alleging that developers "submit their app[s] for review" "[p]rior to being published" by Google). Plaintiffs allege that the Social Casino Apps are illegal based solely on this third-party created content—and regardless of any interaction with Google. *See* 2-ER-232 (citing *Kater v. Churchill Downs Inc.*, 886 F.3d 784, 785 (9th Cir. 2018)). That is, what makes the apps illegal, in Plaintiffs' view, is not generically that payments for in-app content are processed; instead, it is that some of the in-app content that users buy (virtual chips) are later used for certain purposes (to play games mimicking traditional casino games).

### 3. Google's Alleged Role in Facilitating Allegedly Illegal Gambling on the Social Casino Apps

Even though the app developers create and operate the allegedly unlawful Social Casino Apps, Plaintiffs have sued Google for making the apps available and providing services to them—just as Google does for countless other apps that no one contends are illegal. *See* 1-ER-4–6; 2-ER-166–69.

Plaintiffs assert four categories of claims: (1) state gambling loss recovery claims (*e.g.*, 2-ER-265–66); (2) state unfair competition law claims (*e.g.*, 2-ER-281–82); (3) state unjust enrichment claims (*e.g.*, 2-ER-291–92); and (4) RICO claims premised on Google's purported involvement in an illegal "gambling enterprise" (2-ER-306–11). Though listed as separate counts, all four categories of claims depend

on the same alleged conduct, and at their core seek to hold Google liable for publishing the third-party Social Casino Apps and allowing them to operate.

The *gambling loss recovery claims* allege that Google actively participates in the operation of social casinos by "provid[ing] marketing guidance, tools, [and] targeted promotional offers," "providing technology, training, and other tools" that allow the apps to operate on Google's platform, and "offer[ing] and distribut[ing] social casinos through Google Play and facilitat[ing] all in-app purchases." *E.g.*, 2-ER-266.

The *unfair competition claims* assert that "Google is responsible for making social casinos available to the public" and that it "advertises, solicits, and enables the general public … to play unlawful social casinos." *E.g.*, 2-ER-287, 301. The claims also aver that "[b]y hosting and facilitating the Illegal Slots, Google engaged in unfair competition." 2-ER-259, 261.

The *unjust enrichment claims* allege that Google unjustly "profits" from its "operation of social casinos" by "providing marketing guidance, tools, and other assistance to the developers of social casinos" and then taking the same commission it takes for every app that it publishes and that uses this service. *E.g.*, 2-ER-288.

The *RICO claims* allege that Google (along with Apple and Facebook) conspired with the Social Casino Apps to form an illegal gambling enterprise, in which the Social Casino Apps "develop[], updat[e] and operat[e] the illegal slot machines,"

while the platforms "serv[e] as the gambling premises, host[] the virtual social gambling applications and process[] all in-app transactions in exchange for a share in the gamblers' losses." 2-ER-308–09.

### B. Procedural History

#### 1. Plaintiffs' Claims Are Centralized In An MDL.

In late 2020 and early 2021, Plaintiffs filed multiple putative class actions around the country based on Google's hosting of allegedly unlawful Social Casino Apps in the Google Play store. 2-ER-325. Those actions were centralized for pretrial purposes in the Northern District of California on June 3, 2021, as MDL No. 3001 ("Google MDL"). 2-ER-333. In centralizing the Google actions, the U.S. Judicial Panel on Multidistrict Litigation ("JPML") declined to "expand" an "existing MDL" in the Northern District of California, "*In re Apple App Store Simulated Casino-Style Games Litig.*, MDL No. 2985," which involved similar claims alleged against Apple ("Apple MDL"). 2-ER-333. The JPML reasoned that, "[a]lthough the casino-style games at issue in the Google actions appear to be largely the same games, the factual questions concerning Google's conduct in promoting the games—and its contracts with app developers—appear to be distinct from Apple's conduct and contracts." 2-ER-334–35. Instead, the JPML assigned both MDLs to the Honorable Edward J. Davila, and left the degree of coordination between the two MDLs to his discretion. 2-ER-335.

Two copycat actions were also filed against Meta, consolidated, and reassigned to Judge Davila ("Meta Actions"). *E.g.*, Order Relating Cases, *Wilkinson v. Meta Platforms, Inc. (f/k/a/ Facebook, Inc.)*, No. 5:21-cv-02777-EJD (N.D. Cal. June 30, 2021), ECF No. 32; Order Reassigning Case, *id.* (N.D. Cal. June 30, 2021), ECF No. 33; Order Relating Cases, *Boorn v. Meta Platforms, Inc. (f/k/a Facebook, Inc.*), No. 5:21-cv-02818-EJD (N.D. Cal. June 30, 2021), ECF No. 7.

Judge Davila "informally coordinated" the consolidated Meta Actions, Apple MDL, and Google MDL. *See* Stipulation and Order re Pleadings and Case Management, *Boorn v. Meta Platforms, Inc. (f/k/a Facebook, Inc.*), No. 5:21-cv-02818-EJD (N.D. Cal. Sept. 3, 2021), ECF No. 22.

### 2. Plaintiffs File A Master Complaint And Google Moves To Dismiss.

On November 22, 2021, Plaintiffs in the Google MDL filed a master complaint. 2-ER-228–315. Though Google sought leave to raise all the fatal pleading defects with the master complaint in its Rule 12 briefing, the court ultimately limited initial motion practice solely to the question of immunity under Section 230. 2-ER-226–27. The court ordered each defendant to file a separate motion to dismiss, and ordered Plaintiffs to file a consolidated response to all three motions. 2-ER-226–27.

In its motion to dismiss, Google argued that all three elements of this Court's established framework for Section 230 protection were satisfied and that the statute therefore barred all of Plaintiffs' state law and RICO claims. 2-ER-203–04 (citing

*Barnes v. Yahoo!, Inc.*, 570 F.3d 1096 (9th Cir. 2009)). In response, Plaintiffs challenged only the "second prong of the *Barnes* test"—*i.e.*, that the Plaintiffs' "cause of action inherently requires the court to treat the defendant as the 'publisher or speaker' of content provided by another." *See generally* 2-ER-172 (quoting *Barnes*, 570 F.3d at 1100-01). Plaintiffs expressly conceded that the first element was met and elected not to address the third based on Plaintiffs' view that the second element was "dispositive." 2-ER-172.

### 3. The District Court Divides Plaintiffs' Allegations Into Three Theories, Concludes That Section 230 Bars Two, And Certifies Its Order For Interlocutory Appeal.

The district court addressed all three defendants' motions to dismiss in a single order, which granted the motions in part and denied them in part. 1-ER-2–38. In analyzing the second element of the *Barnes* test, the court identified three distinct "theories" underpinning Plaintiffs' claims. The Court analyzed Section 230's applicability separately as to each of these three theories even though, as Plaintiffs expressly acknowledge, "[t]he district court's order d[id] not identify any particular claim that depends solely on one of the rejected theories." 2-ER-69.

The district court identified Plaintiffs' first "theory of liability" as challenging Defendants' allegedly having "promoted the illegal casino applications in their App Stores and thus induced users to play the illegal games." 1-ER-32. That theory, the court correctly held, "is easily dismissed" because Section 230 immunizes web

10

platforms from "actions that rely on algorithms to 'amplify and direct users to content'" 1-ER-32–33 (citing *Dyroff v. Ultimate Software Grp., Inc.*, 934 F.3d 1093, 1099 (9th Cir. 2019); *Gonzalez v. Google LLC*, 2 F.4th 871 (9th Cir. 2021)).

As for Plaintiffs' "third theory" that Google "work[ed] with developers to increase user engagement" by providing data analytics tools (i.e., "targeted advertising"), the court held that Section 230 again barred any claim. 1-ER-32–33, 35–36. In doing so, the court correctly rejected the contention that Google's generally applicable advertising analytics had "contribute[d] to the alleged illegality" of the games. 1-ER-35. It correctly reasoned that Google's alleged involvement was comparable to non-actionable recommendations and that Google engaged in "a classic editorial role." 1-ER-35–36.

The district court held, however, that Section 230 did not bar what it labeled Plaintiffs' "second theory of liability"—that Google provided payment-processing tools to the app developers in connection with users' purchase of virtual chips within the apps. 1-ER-32, 34. The court recognized that "a website does not become responsible for the development of a third-party's offensive content merely by providing 'neutral tools' that a third-party might use to create the offensive content." 1-ER-32. But the court reasoned that "Plaintiffs seek to impose liability for the Platforms processing of *unlawful* transactions for *unlawful* gambling. Accordingly, the

requested relief is grounded in the Platforms' own bad acts, not in the content of the social casino apps that the Platforms display on their websites." 1-ER-34.

The district court did not address whether Plaintiffs could support any viable claim based solely on the payment-processing allegations that it carved out of Section 230—or whether Plaintiffs' complaint even tried to do so. *See* 2-ER-69. Instead, the court "*sua sponte*" certified its "order for immediate interlocutory appeal" pursuant to 28 U.S.C. § 1292(b), reasoning that "reasonable minds could differ" as to whether Plaintiffs' "second theory of liability"—the payment-processing theory— survives Section 230 immunity. 1-ER-37. The court noted that if "the Ninth Circuit reverses this Court's holding" on that issue, that would resolve the case "in its entirety." 1-ER-37.

Following the district court's directive, Google, Apple, and Meta petitioned for interlocutory appeal under 28 U.S.C. § 1292(b). 22-80098 (Google), ECF Nos. 1-2; 22-80099 (Apple), ECF Nos. 1-2; 22-80100 (Meta), ECF Nos. 1-2. Plaintiffs opposed all three petitions but alternatively requested permission to cross-appeal the district court's "incorrect dismissal of legal theories at the pleading stage." 2-ER-65–66. "Putting aside whether Plaintiffs actually set forth three different theories of liability," Plaintiffs argued that if any one of their "three different theories of liability … is viable, then the claim as a whole is pleaded sufficiently" and the district court

"should have denied Defendants' motions in full," rather than parsing Plaintiffs' different theories and dismissing "parts of claims." 2-ER-68–69.

On December 13, 2022, this Court granted Google's petition to appeal as well as the Plaintiffs' conditional cross-appeal. 22-80098, ECF No. 9; 22-16921 (appeal), ECF No. 1; 22-16923 (cross-appeal), ECF No. 1. It likewise allowed an appeal and cross-appeal in the cases against Apple, 22-16914 (appeal); 22-16916 (cross-appeal), and Meta, 22-16888 (appeal); 22-16889 (cross-appeal).

## SUMMARY OF ARGUMENT

**1.** Section 230(c)(1) bars claims against "(1) a provider or user of an interactive computer service (2) whom a plaintiff seeks to treat … as a publisher or speaker (3) of information provided by another information content provider." *Barnes*, 570 F.3d at 1100-01. "There is no dispute" that two of the three elements for Section 230 preemption are met here. 1-ER-10. In the district court, Plaintiffs expressly conceded that Google is an interactive computer service provider, and deliberately chose not to address Google's argument that *Barnes*' third element was satisfied, thus waiving any argument that Google provided any of the supposedly unlawful information content at issue here (the Social Casino Apps and the virtual chips sold and used within them). Accordingly, the only issue on appeal is whether Plaintiffs' causes of action "inherently require[] the court to treat the defendant as the 'publisher or speaker' of

13

content provided by another." *Barnes*, 570 F.3d at 1102 (quoting 47 U.S.C.
§ 230(c)(1)).

**2.**  It is clear from Plaintiffs' complaint that all of Plaintiffs' claims seek to
treat Google as a publisher. The complaint expressly seeks to hold Google "respon-
sible for making social casinos available to the public" and uses variants of "host,"
"distribute," and "operate" dozens of times. *E.g.*, 2-ER-281, 287, 301, 305. Accord-
ing to Plaintiffs, the Social Casino Apps and the content within them, such as virtual
chips, are illegal and Google should be held liable because Google makes the apps
available by offering the same publishing services that it provides to all apps avail-
able on the Google Play store. This "is precisely the kind of activity for which Con-
gress intended to grant absolution with the passage of section 230." *Fair Hous.*
*Council of San Fernando Valley v. Roommates.com, LLC*, 521 F.3d 1157, 1171-72
(9th Cir. 2008) (en banc).

Rather than evaluating the claims as a whole, the district court parsed Plain-
tiffs' allegations into three "theories of liability" and separately analyzed the appli-
cation of Section 230 to each. The court correctly recognized that Section 230 barred
two of the three that were predicated on Google allegedly promoting and providing
marketing support to Social Casino Apps on its platform. These two "theories" were
"easily dismissed" as they targeted Google in a "classic editorial role." 1-ER-32–34,

14

36. Because these two theories encapsulate the heart of Plaintiffs' claims, the district court should have stopped its analysis there and dismissed the action in its entirety.

Nevertheless, the court proceeded to isolate allegations about Google's processing of payments for in-app purchases of in-app content and concluded that these allegations, in a vacuum, concerned Google's "own bad acts." 1-ER-34. But Plaintiffs never argued or alleged that those allegations could be an independent basis for holding Google liable. To the contrary, those allegations were only ever alleged to be a component part of the broader publishing services Google allegedly provides. The complaint challenged Google's publishing services as a whole: "promotion, distribution, and payment processing." 2-ER-231. Legally or factually, allegations of payment processing cannot be disaggregated from Google's protected third-party publishing activity. Because payment processing was alleged to be merely one element of Google's clearly protected publishing of third-party content, there was and is no need to consider whether payment processing standing alone is protected by Section 230.

**3.** Even assuming Section 230 could be applied to those allegations in isolation and unmoored from any theory of liability, Section 230 bars the payment-processing allegations asserted here. A claim involving payment processing treats a defendant as a publisher when it would hold the defendant responsible for the allegedly wrongful nature of the purchased third-party content.

That is this case. The virtual chips at issue here are digital content created by third-party app developers at the behest of users who purchase them for use within the app environment. And Plaintiffs seek to hold Google liable solely based on what that digital content is and how users elect to use it. It makes no difference that through "creative pleading," *Kimzey v. Yelp! Inc.*, 836 F.3d 1263, 1265 (9th Cir. 2016), Plaintiffs have characterized their allegations as targeting Google's sale or processing of payments for virtual chips. In the context of this case, that merely describes publishing allegedly unlawful content for a fee. But there is no paid content exception to Section 230.

Neither *HomeAway.com, Inc. v. City of Santa Monica*, 918 F.3d 676 (9th Cir. 2019) nor *Gonzalez v. Google LLC*, 2 F.4th 871 (9th Cir. 2021) require or suggest a different result. In those cases, liability did not in any way turn on the nature of third-party content published online, but instead was premised entirely on the delivery of payments or the processing of real-world transactions. In *HomeAway*, the alleged illegal activity was completing booking transactions for certain brick-and-mortar rental properties; the illegality was not in any way based on what third-party content the defendant published. Similarly in *Gonzalez*, allegedly providing money to a designated foreign terrorist organization was illegal, full stop. Whether that revenue derived from publishing third-party content (or what the published content was) made no difference.

Here, by contrast, Plaintiffs' theory turns not on payment processing in the abstract, but on the processing of payments *in exchange for the creation and publication of certain third-party content*: "virtual chips" used for allegedly illegal online gambling. If users purchased different content (digital avatars for players to wear, for example) or used the virtual chips in different ways (to play a non-"Casino" game, for example), Plaintiffs would have no conceivable claim. Critically, therefore, Plaintiffs' claims require the court to review both the third-party content and the way it is used within the online environment before it can evaluate whether Google's actions are culpable. A claim that rises or falls based on the nature of third-party content published by an interactive computer service provider falls squarely within Section 230's protections.

## STANDARD OF REVIEW

This Court "review[s] de novo a district court's denial of a motion to dismiss under Rule 12(b)(6)." *Olympic Forest Coal. v. Coast Seafoods Co.*, 884 F.3d 901, 905 (9th Cir. 2018). To survive a motion to dismiss under Rule 12(b)(6), a complaint must plead "sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Disability Rts. Montana, Inc. v. Batista*, 930 F.3d 1090, 1096 (9th Cir. 2019). Courts "need not accept as true legal conclusions or threadbare recitals of the elements of a cause of action, supported by mere conclusory statements." *Whitaker v. Tesla Motors, Inc.*, 985 F.3d 1173, 1176 (9th Cir. 2021) (internal

quotation marks and alterations omitted). A motion to dismiss should be granted when "the allegations, taken as true, show that the plaintiff is not entitled to relief" because of a defense like Section 230. *Jones v. Bock*, 549 U.S. 199, 215 (2007). This Court regularly dismisses claims based on Section 230 at the pleadings stage. *E.g.*, *Dyroff*, 934 F.3d at 1101; *Gonzalez*, 2 F.4th at 913.

## ARGUMENT

### I.     Section 230 Protects Interactive Computer Service Providers Like Google From Claims Seeking To Hold Them Liable For Third-Party Content Like Social Casino Apps.

Section 230(c)(1) provides that "[n]o provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider." 47 U.S.C. § 230(c)(1). This provision "protects websites from liability for material posted on the website by someone else." *Doe v. Internet Brands, Inc.*, 824 F.3d 846, 850 (9th Cir. 2016).

Congress enacted Section 230 "for two basic policy reasons: to promote the free exchange of information and ideas over the Internet and to encourage voluntary monitoring for offensive or obscene material." *Carafano v. Metrosplash.com, Inc.*, 339 F.3d 1119, 1122 (9th Cir. 2003); *see also Batzel v. Smith*, 333 F.3d 1018, 1027-28 (9th Cir. 2003) ("Section 230 was enacted, in part, to maintain the robust nature of Internet communication, and accordingly, to keep government interference in the

medium to a minimum."). To further those goals, the statute "protects certain internet-based actors from certain kinds of lawsuits." *Barnes*, 570 F.3d at 1099.

This Court has established a three-part test for applying Section 230. The statute "protects from liability (1) a provider or user of an interactive computer service (2) who a plaintiff seeks to treat ... as a publisher or speaker (3) of information provided by another information content provider." *Barnes*, 570 F.3d at 1100-01.

In this case, "[t]here is no dispute that prongs one and three are satisfied." 1-ER-10. The Google Play store—the only Google service at issue here—is a "paradigmatic interactive computer service[]" because it is a website "from which customers can locate and download apps developed, written, and branded by third parties." *Free Kick Master LLC v. Apple Inc.*, 140 F. Supp. 3d 975, 981 (N.D. Cal. 2015). And the information at issue—the Social Casino Apps and in-app content like the virtual chips—is provided by third-party app developers, not by Google.

"Only the second" element is at issue here. 1-ER-10, 32. In applying that element, "what matters is whether the cause of action inherently requires the court to treat the defendant as the 'publisher or speaker' of content provided by another." *Barnes*, 570 F.3d at 1101-02. "Indeed, many causes of action might be premised on the publication or speaking of what one might call 'information content.'" *Id.* at 1101. Courts have consistently applied Section 230 to bar a wide variety of causes of action. *See id.* (negligent undertaking claim); *accord Roommates*, 521 F.3d at

1175 (Fair Housing Act claims); *Dyroff*, 934 F.3d at 1096-1100 (negligence, wrongful death, premises liability, civil conspiracy, and unjust enrichment claims); *Kimzey*, 836 F.3d at 1268-70 (RICO, unfair competition, and libel claims).

In assessing whether a claim "treats" the defendant as the "publisher or speaker," "courts must ask whether the duty that the plaintiff alleges the defendant violated derives from the defendant's status or conduct as a 'publisher or speaker.' If it does, section 230(c)(1) precludes liability." *Barnes*, 570 F.3d at 1102.

This Court and others have repeatedly applied Section 230 to protect the many ways that interactive computer services make allegedly harmful or illegal third-party content available online. Examples of protected publishing activity have included a newsletter editor's decision to include a false tip in an email newsletter, *Batzel*, 333 F.3d at 1021-22; a payment-processing service's processing of payments for third-party websites that host copyright-infringing material, *Perfect 10, Inc. v. CCBill LLC*, 488 F.3d 1102, 1118-19 (9th Cir. 2007); a consumer review website's aggregating reviews into "star rating[s]" and "proactively post[ing] ad[s]" about the reviews, *Kimzey*, 836 F.3d at 1267, 1270 & n.5; and a social media website's allegedly recommending terrorist content to users likely to be interested in such content, *Force v. Facebook, Inc.*, 934 F.3d 53 (2d Cir. 2019).[1]

---

[1] Consistent with the holding in *Force*, this Court has also held that Section 230 shielded a video-hosting website from liability for individualized video recommendations made through "content-neutral algorithms." *Gonzalez*, 2 F.4th at 896.

Taken together, these decisions make clear that Section 230 provides a "quite robust" protection encompassing more than just passive content-hosting. *Carafano*, 339 F.3d at 1123. It "shields from liability all publication decisions," such as "reviewing, editing, and deciding whether to publish or to withdraw from publication third-party content." *Barnes*, 570 F.3d at 1102, 1105; *see also Jones v. Dirty World Entm't Recordings LLC*, 755 F.3d 398, 407 (6th Cir. 2014). And while Section 230 is subject to certain specific exceptions, such as for alleged violations of federal criminal law and for certain sex trafficking claims, (*see* 47 U.S.C. § 230(c)(e)(1), (5)), there is no exception for claims based on allegedly illegal gambling. Section 230 thus protects "any activity that can be boiled down to deciding whether to exclude material that third parties seek to post online." *Roommates*, 521 F.3d at 1170-71.

## II. Having Correctly Found That Section 230 Barred Plaintiff's Hosting, Promotion, and Marketing Allegations, The District Court Erred In Applying Section 230 To Payment-Processing Allegations That Were Never Alleged To Form An Independent Basis For Liability.

In addressing whether Plaintiffs' claims "'treat'" Google "'as a publisher or speaker'" of the Social Casino Apps, the district court separated Plaintiffs' allegations into three distinct "theories of liability." 1-ER-32 (quoting *Barnes*, 570 F.3d at

---

Although the opinion was vacated because the Supreme Court held that the plaintiffs had likely "failed to state a viable claim in any event," such that it need not address Section 230, *see Gonzalez v. Google LLC*, 143 S. Ct. 1191, 1192 (2023), the reasoning in *Gonzalez* remains a persuasive interpretation of Section 230.

1100-01). The court correctly recognized that two of the three theories were "easily dismissed." 1-ER-32–34, 36. Because these two theories are foundational to every one of Plaintiffs' claims, the district court could have—and should have—stopped its analysis there. There was no reason for the district court to isolate Plaintiffs' payment-processing allegations in the abstract, as those allegations were only ever alleged to be part and parcel of Plaintiffs' claims: Plaintiffs' Complaint did not assert (and could not have asserted) payment processing as a standalone claim or theory of liability.

That all of Plaintiffs' claims seek to treat Google as a publisher is clear from the complaint, which expressly seeks to hold Google "responsible for making social casinos available to the public" and uses variants of "host," "distribute," and "operate" dozens of times. *E.g.*, 2-ER-281, 287, 301, 305. At bottom, each of Plaintiffs' causes of action attempts to hold Google liable for facilitating the publication and operation of the allegedly illegal Social Casino Apps and the virtual chips sold and used within them. This "is precisely the kind of activity for which Congress intended to grant absolution with the passage of section 230." *Roommates*, 521 F.3d at 1171-72.

As an initial matter, the court correctly dismissed Plaintiffs' claims insofar as they were predicated on two of the three theories the court identified. Under the first, Plaintiffs sought to hold Google liable for hosting the Social Casino Apps or for

promoting them with recommendations and notifications. 1-ER-33. Attempting to hold Google liable for hosting or promoting third-party content, however, is at the very core of what Section 230 prohibits. *See Dyroff*, 934 F.3d at 1098-99; *Barnes*, 570 F.3d at 1102; *see also* 1-ER-34. Plaintiffs conceded as much below. *See* 2-ER-170 (stating that "Plaintiffs' claims do not seek to hold the Platforms liable for publishing or hosting social casino apps"); 2-ER-174 (stating that they "do not seek to hold the Platforms liable for hosting or publishing the social casino games").

The district court also correctly rejected Plaintiffs' theory that "sharing data with the social casino app developers" through neutral tools made Google responsible for the games' targeted advertisements. 1-ER-35–36. As the court reasoned, these data analytics tools function similarly to the minor edits and selections made by the editor in *Batzel*. *See* 1-ER-35; *Batzel*, 333 F.3d at 1031. Google does not become responsible for user-created content under Section 230 by providing data and functionality to help third parties more efficiently create or promote content. As this Court explained in *Dyroff*, plaintiffs "cannot plead around Section 230 immunity by framing these website features as content." 934 F.3d at 1098. Like the features at issue there, Google's analytics "are tools meant to facilitate the communication and content of others. They are not content in and of themselves." *Id.* And the fact that such generally available tools may help the apps proliferate or more effectively reach

an audience is of no moment—"proliferation and dissemination of content" falls comfortably within Section 230. *Kimzey*, 836 F.3d at 1270-71.

Having correctly applied Section 230 to these allegations, the district court should have stopped there and dismissed the action in its entirety. Whatever the significance of Plaintiffs' payment-processing allegations, those allegations were never pled as a freestanding basis for any of Plaintiffs' claims. Plaintiffs do not allege that Google violated any of the underlying statutes (or common law proscriptions) simply by processing payments for in-app purchases within the Social Casino Apps.[2] Instead, payment processing is merely alleged to be part and parcel of the publishing activities the district court correctly held are barred by Section 230. Plaintiffs allege that Google is a "center[] for promotion, distribution, and payment," and that Google received a 30% commission on in-app transactions in exchange for "promotion, distribution, and payment processing." 2-ER-230–31. Every claim of the complaint turns on this single, unitary theory.

---

[2] Nor could they have asserted such a claim, as it would have failed as a matter of law. For example, courts have rejected claims seeking to hold credit card companies liable for processing transactions to buy casino chips, reasoning that the credit card companies "completed their transaction with the Plaintiffs *before* any gambling occurred." *In re MasterCard Int'l Inc.*, 313 F.3d 257, 262 (5th Cir. 2002) (applying Kansas law); *see also Reuter v. MasterCard Int'l, Inc.*, 921 N.E.2d 1205, 1213 (Ill. App. Ct. 2010) (applying Illinois law).

Simply put, neither Plaintiffs nor the district court ever cited any authority to support a theory that Google's payment processing for virtual chips is an independent basis for liability capable of supporting any of their causes of action. Rather, those allegations are only alleged to be actionable when coupled with allegations that Google distributed, promoted, or otherwise supported the operations of allegedly illegal third-party apps, which in turn allow allegedly illegal gambling.

As such, under the district court's own analysis, Plaintiffs' actual causes of action seek to "treat" Google as a publisher of third-party content. Such claims cannot proceed under Section 230. *See Barnes*, 570 F.3d at 1101-02. There was thus no need for the district court—and no need for this Court—to decide the theoretical question of whether payment processing divorced from core publishing activity is protected by Section 230. The Court can reverse and dismiss the complaint in full without reaching that question.

## III. The District Court Erred In Holding That Section 230 Does Not Preempt Plaintiffs' Payment-Processing Allegations.

Even if Section 230's application to "payment-processing" allegations could be decided in the abstract, divorced from the claims actually pled, the district court erred in permitting those allegations to proceed. As a matter of text and precedent, allegations of payment processing, or selling, treat a defendant as a publisher when they would hold the defendant responsible for the allegedly wrongful nature of the purchased third-party content—here, virtual chips.

25

### A.     Section 230 Protects Processing Payments For Publishing.

By its terms, Section 230 protects publishing for a fee. Section 230(c)(1) pro-hibits treating interactive computer services as the "publisher" of third-party content. The ordinary meaning of "publisher" is "one whose *business* is publication." *Barnes*, 570 F.3d at 1102 (emphasis added) (quoting Webster's Third New International Dictionary 1837 (Philip Babcock Gove ed., 1986)). Congress expressly intended that Section 230 would protect profit-making, "vibrant[,] and competitive free market" publishing activity. *See* 47 U.S.C. § 230(b)(2) ("It is the policy of the United States … to preserve the vibrant and competitive free market that presently exists for the Internet and other interactive computer services … ."). Indeed, it was a core purpose of Section 230 to "promote the development of e-commerce." *Batzel*, 333 F.3d at 1027. Congress's definition of "interactive computer service," which includes "enabling tools" that "transmit … content," underscores that the statute protects payment-processing tools enabling the transmission of content. *See* 47 U.S.C. § 230(f)(4).

Consistent with the plain text, courts routinely apply Section 230's protections to services that charge fees for or otherwise profit from their publishing activity. The dating website in *Carafano* allowed users to post and view dating profiles "[f]or a fee." 339 F.3d at 1121. Similarly, the roommate locator service in *Roommates* "profit[ed] by collecting revenue from advertisers and subscribers." *Roommates*, 521 F.3d at 1161. Yelp, the consumer review website at issue in *Kimzey*, displayed paid

26

"advertising" next to user reviews. 836 F.3d at 1267. The domain name registrar in *Rigsby v. GoDaddy Inc.*, 59 F.4th 998, 1003 (9th Cir. 2023) registered domain names for an annual "fee." The website and listserv in *Batzel* profited by hosting paid "advertisements." 333 F.3d at 1023. Simply put, Section 230 protects publishing for payment as the rule, not the exception.

Many courts have thus held that "there is no 'for-profit exception to § 230's broad grant of immunity." *Fed. Agency of News LLC v. Facebook, Inc.*, 432 F. Supp. 3d 1107, 1119 (N.D. Cal. 2020) (Koh, J.); *see also Hinton v. Amazon.com.DEDC, LLC*, 72 F. Supp. 3d 685, 686, 690 n.9 (S.D. Miss. 2014); *M.A. ex rel. P.K. v. Vill. Voice Media Holdings, LLC*, 809 F. Supp. 2d 1041, 1050 (E.D. Mo. 2011); *Goddard v. Google, Inc.*, 2008 WL 5245490, at *3 (N.D. Cal. Dec. 17, 2008). Courts likewise recognize that publishing content "for monetary purposes" does not remove a service from Section 230's protections. *Fyk v. Facebook, Inc.*, 808 F. App'x 597, 598 (9th Cir. 2020); *see also Blumenthal v. Drudge*, 992 F. Supp. 44, 51 (D.D.C. 1998) (holding that Section 230 protected content that AOL paid for and "promoted to its subscribers and potential subscribers as a reason to subscribe").

This Court's decision in *CCBill*, exemplifies the point. There, the plaintiffs brought claims against an online service (CCBill) that "allow[ed] consumers to use credit cards or checks to pay for subscriptions or memberships to e-commerce venues." 488 F.3d at 1108. CCBill provided payment-processing services to certain

third-party websites hosting allegedly pirated images. In addition to a separate web hosting service, Plaintiffs sought to hold CCBill liable for allegedly facilitating the unlawful traffic in these images and financially benefiting from infringing conduct. But this Court held that CCBill's payment-processing service was "eligible for CDA [Section 230] immunity" because the statute bars claims "that would make service providers liable for information originating with a third-party user." *Id.* at 1118-19.

As this case illustrates, payment processing alone does not vitiate Section 230 immunity, and Section 230 protection does not vanish simply because a service provider has facilitated access to allegedly illegal third-party content for a fee.

**B.     Plaintiffs' Payment-Processing Allegations Seek To Hold Google Liable For Facilitating the Creation And Use Of Allegedly Illegal Third-Party Content Online.**

Applying these principles here, Section 230 bars Plaintiffs' payment-processing theory. That theory seeks to impose liability on Google for processing payments *for the creation and publication of content*—allegedly illegal virtual chips. Plaintiffs contend that "Google operates as the payment processor for all in-app purchases of virtual chips in the Illegal Slots on the Google Platform." 2-ER-237. As the Plaintiffs put it, their complaint boils down to "[d]on't sell *illegal casino chips*." 2-ER-126–27 (emphasis added); 2-ER-125 ("we are challenging the platform sale of *this illegal good*," i.e., "selling casino chips" (emphasis added)); *see also* 1-ER-34.

Plaintiffs' own articulation of their theory brings it comfortably within Section 230. The virtual chips are indisputably third-party-generated content, 2-ER-237, published within the online app environment, as are the in-app games and features that integrate and use the virtual chips. By purchasing the chips from third-party developers, users prompt the apps to create this content, to bring into virtual existence a new set of chips and make them available for use within the app.

In this respect, the virtual chips are similar to the wide variety of other content that may be available for purchase and use within apps hosted in the Google Play store—from digital avatars or virtual items that game characters can use, to premium articles or ad-free videos that might be available to subscribers in a news or streaming app, to dating profiles that may require payment to access and engage with. Plaintiffs concede that the chips and apps are content. 1-ER-32; 2-ER-172. And Google acts as the publisher of these virtual chips by making them available to the users who purchase them, using the same tools generally available to all apps and paid content on Google's platform.

No amount of "creative pleading," *Kimzey*, 836 F.3d at 1265, can change that the chips are content, created, purchased, and used entirely within an online service published by Google. It does not matter that Plaintiffs have characterized publishing that content as selling that content. Selling content is just publishing content for a fee, which this Circuit has repeatedly held Section 230 protects. *See supra* at 26-28.

29

Indeed, at their core, Plaintiffs' claims seek to force Google to exclude certain paid content from its Google Play store. Their theory, that is, would hold Google liable for allowing certain kinds of content to be created and used within an online app environment. But decisions about what content to permit or exclude is "perforce immune under section 230." *Roommates*, 521 F.3d at 1170-71.

The district court therefore erred in concluding that Plaintiffs' allegations are "grounded in the Platforms' own bad acts, not in the content of the social casino apps that the Platforms display." 1-ER-34. According to the district court, Plaintiffs challenged the "processing of *unlawful* transactions for *unlawful* gambling." 1-ER-34. But under Plaintiffs' theory, the processing of transactions is allegedly unlawful only because of the nature of the specific content created and used via the process Google facilitates—virtual chips that allegedly facilitate unlawful gambling. Indeed, the processing of payments for the chips is not even allegedly unlawful at the time it happens; whether there is a violation, according to Plaintiffs, depends not on what Google does but on how third parties choose to use the virtual chips after they are purchased. *See* 2-ER-229, 237.

Plaintiffs insist that "[s]ubstantially all virtual chips" are used to gamble. 2-ER-237; *see also* 2-ER-164 (arguing chips are "substantially certain" to be used on gambling); 1-ER-33. But that only makes clear that it is not the mere purchase (or payment processing) that is supposedly illegal. Instead, the alleged illegality results

30

from the nature of the content created by third-party app developers and what third-party users ultimately do with that content within the apps. *See* 2-ER-236 ("[p]layers use those chips to play the animated slot machines"); 2-ER-237 (chips can be used to play "card game[s] or bingo titles" or to "'gift'" chips to other accounts). If users purchase a new outfit for their digital avatars to wear in a "Social Casino" or if they gift the virtual chips to another user (or simply hoard the chips, rather than play a virtual slot machine), nothing even allegedly unlawful has happened. Plaintiffs' claims thus require a court to determine whether the third-party content (virtual chips) is used for allegedly unlawful gambling before the court could evaluate whether Google's processing of the in-app purchase (and its ensuing publication) triggers liability for unlawful gambling.

In sum, Plaintiffs seek to hold Google liable based on the creation and use of third-party content. What Plaintiffs call payment processing is in fact simply publishing allegedly illegal paid content—i.e., "allow[ing]" and "transmit[ting]" that "content," 17 U.S.C. § 230(f)(4)—which "is precisely the kind of activity for which Congress intended to grant absolution with the passage of section 230." *Roommates*, 521 F.3d at 1171-72. Because Plaintiffs' "claims, at bottom, depend[] on a third party's content, without which no liability could have existed," *Lemmon*, 995 F.3d at 1094, they are barred by Section 230.

**C. Because Plaintiffs' Claims Depend On Allegedly Unlawful User Content, They Are Fundamentally Different From The Claims Asserted In *HomeAway* And *Gonzalez*.**

In holding that Section 230 did not immunize Defendants against Plaintiffs' payment-processing allegations, the district court pointed to this Court's decisions in *HomeAway* and *Gonzalez* (1-ER-34), but those cases do not save Plaintiffs' theory here. The animating factors in those cases were that (i) the claims were based entirely on the delivery of payments or the processing of offline transactions divorced from any third-party information content; and (ii) the platforms could comply with the relevant laws by cross-referencing a government registry without having to review or assess any published third-party content. *See HomeAway*, 918 F.3d at 684; *Gonzalez*, 2 F.4th at 898.

In *HomeAway*, the Court held that Section 230 did not bar claims brought under a city ordinance regulating short-term property rentals. 918 F.3d at 684. The ordinance required homeowners seeking to list their property for short-term rental to register with the city, and it prohibited service providers from processing booking transactions for rentals of properties that did not appear on the registry. *Id.* at 680. Because the ordinance could be applied without reference to—or any need to monitor, police, or remove—third-party content on the platforms' websites, the Court concluded that Section 230 did not preempt the ordinance. *Id.* at 683-84.

32

Central to *HomeAway*'s reasoning, as is clear throughout the Court's opinion, was that the ordinance did "not proscribe, mandate, or even discuss the content of the listings that the Platforms display on their websites." *Id.* at 683. The platforms could comply with the ordinance by "cross-referenc[ing] bookings against Santa Monica's property registry." *Id.* at 682. In other words, whether a given booking was unlawful did not turn in any way on content published by the platforms; instead, liability was based solely on whether the property requested to be booked appeared on the city's registry. *Id.* If it was, the platform could not process transactions for those properties, and whether the platform elected to host or remove content describing the properties was irrelevant. *Id.* at 683. This Court underscored the point in its decision in *Dyroff*, which distinguished *HomeAway* on exactly this basis: "the vacation rental platforms did not face liability for the content of their listings; rather liability arose from facilitating unlicensed booking transactions." 934 F.3d at 1098.

Similarly, in *Gonzalez*, this Court considered whether Section 230 immunizes an online platform (YouTube) from liability under the federal Anti-Terrorism Act ("ATA"). For claims that sought to "impose liability for the content Google allowed to be posted on its platform," the Court held that Section 230 applied. 2 F.4th at 891. But Section 230 did not apply to a discrete claim that sought (although ultimately failed) to hold YouTube liable under the federal material support statute for allegedly

sharing advertising revenue with ISIS. *Id*. at 897-99; *Twitter, Inc. v. Taamneh*, 143 S. Ct. 1206, 1230 (2023).

That holding turned on the particular nature of the material support law, which categorically prohibits giving money to entities designated as "foreign terrorist organizations." *Gonzalez*, 2 F.4th at 899, 901. As such, the revenue-sharing claim (like the ordinance in *HomeAway*) did not turn on the content that was created and posted, or whether any content had been created at all. Providing money to ISIS would be illegal under the ATA without regard to what videos or advertising appeared on YouTube. *Id.* at 898. And because a defendant could comply with the ATA by cross-checking its payees against the U.S. State Department's public list of foreign terrorist organizations, the "alleged violation of the ATA could be remedied without changing any [third-party] content posted" to the platform. *Id.* (citing *HomeAway*, 918 F.3d at 683).

Neither of the two animating factors from *HomeAway* and *Gonzalez* is present here. As discussed, Plaintiffs' theory turns directly on the content of the third-party Social Casino Apps—the payment processing is allegedly illegal because of the content being created and purchased—i.e., the virtual chips, and the specific ways those chips are used in the apps by third parties. There is no external registry Google could cross-reference to determine whether its provision of tools to a given app or for a given user's activity on that app would (in Plaintiffs' view) be unlawful. Instead,

compliance with Plaintiffs' legal theory would require Google to monitor all content on its platform and how users interact with that content so that it could determine whether it must withhold its otherwise lawful and generally available services from certain apps or app content. That is, the determination of what is permitted and what is not would turn entirely on Google's efforts to review and monitor both the third-party content that it publishes and, for any in-app currency like a virtual chip, to subsequently monitor how a given user uses the published content within a particular app. That falls squarely within Section 230. *See HomeAway*, 918 F.3d at 682 (Section 230 applies where the underlying "duty would necessarily require an internet company to monitor third-party content").

### D. Allowing Creative Pleading To Isolate Payment Processing Would Undermine Section 230's Purposes.

Section 230 was intended to foster a nationwide marketplace for digital content, free from the potentially conflicting tort regimes of 50 States. 47 U.S.C. § 230(b)(2); *Zeran v. America Online, Inc.*, 129 F.3d 327, 330-31 (4th Cir. 1997). And as this Court has recognized, a core purpose of Section 230 was to "promote the development of e-commerce." *Batzel*, 333 F.3d at 1027.

All content on the internet is being paid for by someone. Even in the early days of the internet, people were paying for content. *See Cubby, Inc. v. CompuServe, Inc.*, 776 F. Supp. 135, 137 (S.D.N.Y. 1991) (describing a service that provided access to an electronic library and forums in exchange for "a membership fee and

online time usage fees"). If the district court's approach and reasoning is adopted, there will be no shortage of "clever lawyer[s]" trying to recast obviously preempted claims about hosting content as challenges to content-neutral tools for purchasing content. *Cf. Roommates*, 521 F.3d at 1174 ("Websites are complicated enterprises, and there will always be close cases where a clever lawyer could argue that something the website operator did encouraged the illegality."). Under the district court's reasoning, any plaintiff harmed by an unlawful podcast or newsletter could try to sue the online intermediary for their "own bad acts" in "processing of *unlawful* transactions for *unlawful*" content while disclaiming any attempt to impose liability for the hosting of the content. 1-ER-34.

Given how Plaintiffs chose to plead their claims, allowing them to target payment processing separate from the allegedly illegal content would cut the heart out of Section 230, subjecting platforms to death by "ten thousand duck-bites." *See Roommates*, 521 F.3d at 1174. There may be cases (as with the revenue-sharing allegations in *Gonzalez*) where plaintiffs legitimately seek to challenge Section 230's application to payment processing divorced from content. But that is not this case. That is not how Plaintiffs pled their claims, and had they done so, their claims would plainly fail. There is no need to reach the question here or to encourage creative pleading designed to circumvent Section 230.

## CONCLUSION

For these reasons, this Court should reverse the district court's order and remand with instructions to dismiss the complaint in its entirety without leave to amend.

Respectfully submitted,

/s/ Brian M. Willen

| | |
|---|---|
| LAUREN GALLO WHITE | BRIAN M. WILLEN |
| Wilson Sonsini | Wilson Sonsini |
| Goodrich & Rosati, P.C. | Goodrich & Rosati, P.C. |
| 139 Townsend St. Ste. 150 | 1301 Sixth Ave, 40th Floor |
| San Francisco, CA 94107 | New York, NY 10019 |
| (415) 471-3940 | (212) 999-5800 |
| | |
| SAMANTHA MACHOCK | PAUL N. HAROLD |
| Wilson Sonsini | KELSEY J. CURTIS |
| Goodrich & Rosati, P.C. | Wilson Sonsini |
| 12235 El Camino Real | Goodrich & Rosati, P.C. |
| San Diego, CA 92130 | 1700 K Street N.W. |
| (858) 350-2300 | Washington, DC 20006 |
| | (202) 973-8800 |
| TERESA H. MICHAUD | |
| Baker & McKenzie LLP | BRADFORD NEWMAN |
| 10250 Constellation Blvd. | Baker & McKenzie LLP |
| Suite 1850 | 600 Hansen Way |
| Los Angeles, CA 90067 | Palo Alto, CA 94304 |
| (310) 201-4728 | (650) 856-2400 |

*Counsel for Defendants-Appellants/Cross-Appellees*
*Google LLC and Google Payment Corp.*

JULY 24, 2023

37

## STATEMENT OF RELATED CASES

Under Ninth Circuit Rule 28-2.6, Counsel for Defendants-Appellants/Cross-Appellees is aware of the following related cases pending in this Court:

1. *In re: Apple Inc. App Store Simulated Casino-Style Games Litigation*, Nos. 22-16914, 22-16916

2. *In re: Facebook Simulated Casino-Style Games Litigation*, Nos. 22-16888, 22-16889

Each of the cases identified above raises issues that are the same or closely related to those presented by this case.

Dated: JULY 24, 2023

/s/ *Brian M. Willen*

Brian M. Willen
*Counsel for Defendants-Appellants/ Cross-Appellees, Google LLC and Google Payment Corp.*

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

### Form 8. Certificate of Compliance for Briefs

*Instructions for this form:* http://www.ca9.uscourts.gov/forms/form08instructions.pdf

**9th Cir. Case Number(s)** | 22-16921, 22-16923

I am the attorney or self-represented party.

**This brief contains** | 8,562 | **words,** including | 0 | words

manually counted in any visual images, and excluding the items exempted by FRAP

32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

○ complies with the word limit of Cir. R. 32-1.

● is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

○ is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

○ is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

○ complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:

☐ it is a joint brief submitted by separately represented parties.

☐ a party or parties are filing a single brief in response to multiple briefs.

☐ a party or parties are filing a single brief in response to a longer joint brief.

○ complies with the length limit designated by court order dated [          ].

○ is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** | s/ Brian M. Willen | **Date** | 7/24/2023

*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at forms@ca9.uscourts.gov*

**Form 8** | *Rev. 12/01/22*

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system on July 24, 2023. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.


Dated: July 24, 2023

/s/ *Brian M. Willen*
Brian M. Willen
*Counsel for Defendants-Appellants/ Cross-Appellees, Google LLC and Google Payment Corp.*