Nos. 22-16921, 22-16923

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

———————————

IN RE: GOOGLE PLAY STORE SIMULATED CASINO-STYLE GAMES LITIGATION,

JENNIFER ANDREWS, ET AL.,
*Plaintiffs-Cross-Appellants,*

**v.**

GOOGLE LLC, ET AL.,
*Defendants-Appellants.*

———————————

On Appeal from the United States District Court
for the Northern District of California, No. 5:21-md-03001 (Davila, J.)

———————————

## BRIEF OF THE COMPUTER & COMMUNICATIONS INDUSTRY ASSOCIATION AS *AMICUS CURIAE* SUPPORTING DEFENDANTS-APPELLANTS AND REVERSAL IN PART

———————————

Stephanie A. Joyce
Alexandra Sternburg
COMPUTER & COMMUNICATIONS
    INDUSTRY ASSOCIATION
25 Massachusetts Ave. N.W.,
Suite 300C
Washington, DC 20001

William M. Jay
Rohiniyurie Tashima
GOODWIN PROCTER LLP
1900 N Street, N.W.
Washington, DC 20036
wjay@goodwinlaw.com
(202) 346-4000

July 31, 2023                    *Counsel for Amicus Curiae*

## RULE 26.1 DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1, *amicus curiae* states as follows:

The Computer & Communications Industry Association ("CCIA") is a trade association operating as a 501(c)(6) non-profit, non-stock corporation organized under the laws of Virginia. CCIA has no parent corporation and no publicly held corporation owns 10% or more of its stock.

/s/ *William M. Jay*
William M. Jay

July 31, 2023

i

# TABLE OF CONTENTS

**Page**

RULE 26.1 DISCLOSURE STATEMENT.................................................i

INTEREST OF *AMICUS CURIAE*............................................................1

INTRODUCTION AND SUMMARY OF ARGUMENT ..........................2

ARGUMENT .......................................................................................4

    I.   As part of their overall display infrastructure, digital services provide payment-processing systems that third-party content creators and consumers use....................................4

    II.  Section 230 immunity protects digital services' offering of payment-processing systems as part of their app store's or website's infrastructure. ....................................................8

        A.   Plaintiffs' theory of liability seeks to hold digital services liable for the content of third-party apps using the app store's or website's infrastructure. ...........................9

        B.   Imposing liability on digital services for offering payment-processing systems that some third parties use for improper purposes would make doing so prohibitively burdensome. ....................................20

CONCLUSION .......................................................................................24

CERTIFICATE OF COMPLIANCE.....................................................25

CERTIFICATE OF SERVICE...............................................................26

# TABLE OF AUTHORITIES

**Page(s)**

**Cases:**

*Almeida v. Amazon.com, Inc.,*
456 F.3d 1316 (11th Cir. 2006) ...................................................... 10, 11

*Barnes v. Yahoo!, Inc.,*
570 F.3d 1096 (9th Cir. 2009) ............................................................. 11

*Doe v. Internet Brands, Inc.,*
824 F.3d 846 (9th Cir. 2016) .............................................................. 11

*Dyroff v. Ultimate Software Grp.,*
934 F.3d 1093 (9th Cir. 2019) ............................................. 3, 11, 15, 16

*Fair Hous. Council of San Fernando Valley v.*
*Roommates.com, LLC,*
521 F.3d 1157 (9th Cir. 2008) .............................. 13, 14, 15, 16, 17, 19

*HomeAway.com, Inc. v. City of Santa Monica,*
918 F.3d 676 (9th Cir. 2019) ...................................... 10, 12, 13, 16, 17

*Kimzey v. Yelp! Inc.,*
836 F.3d 1263 (9th Cir. 2016) ............................................................. 19

*Perfect 10, Inc. v. CCBill LLC,*
488 F.3d 1102 (9th Cir. 2007) ...................................... 10, 11, 12, 20, 21

*Twitter, Inc. v. Taamneh,*
143 S. Ct. 1206 (2023) .................................................................. 18, 19

*Vargas v. Facebook, Inc.,*
No. 21-16499, 2023 WL 4145434 (9th Cir. June 23, 2023) ................ 14

**Statutes:**

47 U.S.C. § 230 ................................................................. 1, 8, 19, 21, 23

47 U.S.C. § 230(b)(1) .......................................................................... 4, 23

iii

47 U.S.C. § 230(b)(2) ............................................................... 4, 23

47 U.S.C. § 230(c)(1) ................................................................. 10

Cal. Civ. Code § 1798.100(c) (2023) ........................................ 22

Conn. Gen. Stat. § 42-520(a) (2023) ........................................ 22

Ind. Code § 24-15-4-1 (eff. Jan. 1, 2026) ................................. 22

2023 Mont. Laws ch. 681 § 7(1) (eff. Oct. 1, 2024) .................. 22

2023 Or. Laws p. 8 § 5(1) (SB 619-B approved July 18, 2023)
    (eff. July 1, 2024) ................................................................ 22

2023 Tenn. Pub. Acts No. 408 § 47-18-3204(a) (eff. July 1,
    2025) .................................................................................... 22

2023 Tex. Gen. Laws ch. 541 § 541.101(a) (eff. July 1, 2024) ............... 22

Va. Code § 59.1-578(A)(1) (2023) ............................................ 22

**Regulations:**

Colo. Code Regs. § 904-3:6.07 (2023) ...................................... 22

**Other Authorities:**

Apple App Store, *The apps you love. From a place you can
    trust.*, https://www.apple.com/app-store/ ............................ 5

Apple App Store, *Choosing a business model*,
    https://developer.apple.com/app-store/business-models/ ............ 6

Apple iOS, *Submit your iOS apps to the App Store*, https://
    developer.apple.com/ios/submit/ ......................................... 5

Apple Newsroom, *Apple services enrich peoples' lives
    throughout the year* (Jan. 10, 2022), https://www.apple.
    com/newsroom//01/2022vices-enrich-peoples-lives-through
    out-the-year/ ...................................................................... 6

iv

Apple Newsroom, *Meeting pandemic challenges, Apple developers grow total billings and sales in the App Store ecosystem by 24 percent to $643 billion in 2020* (June 2, 2021), https://www.apple.com/newsroom/2021/06/apple-devgrow-app-store-ecosystem-billings-and-sales-by-24-percent-in-2020/ ...................................................................6

Apple Support, *Buy additional app features with in-app purchases and subscriptions*, https://support.apple.com/en-us/HT202023; ....................................................................7

Mayumi Brewster, *Annual Retail Trade Survey Shows Impact of Online Shopping on Retail Sales During COVID-19 Pandemic*, U.S. Census Bureau (Apr. 27, 2022), https://www.census.gov/library/sto//04/ecommerce-sales-surged-during-pandemic.html....................................6

Facebook Help Center, *Making an in-game purchase on Facebook*, https://www.facebook.com/help/22650403 4029906/ ......................................................................7

Google Play Console Help, *Publish your app*, https://support.google.com/googleplay/android-developer/answer/9859751.................6

Google Play Console Help, *Set up your app's prices*, https://support.google.com/googleplay/android-developer/answer/6334373; ..................................................................6

Google Play Help, *Make in-app purchases in Android apps*, https://support.google.com/googleplay/answer/1061913; ....................7

Google Play, *How Google Play works* (June 2021), https://play.google.com/about/howplayworks/ ............................................5, 6

## INTEREST OF *AMICUS CURIAE*[1]

*Amicus curiae* Computer & Communications Industry Association ("CCIA") is an international, not-for-profit trade association representing a broad cross-section of communications and technology firms. For more than fifty years, CCIA has promoted open markets, open systems, and open networks. CCIA members employ more than 1.6 million workers, invest more than $100 billion in research and development, and contribute trillions of dollars in productivity to the global economy.

CCIA and its members have been involved in developing ways of organizing internet content, including content provided by third parties, since the days of the first websites. CCIA is interested in the correct application of Section 230 of the Communications Act, 47 U.S.C. § 230, to today's technology and submits this brief to assist the Court in understanding how payment-processing systems are integral parts of the overall infrastructure of app stores and websites and to show the potential harms stemming from a rule imposing liability on digital

---

[1] No party or party's counsel authored this brief in whole or in part. No party, party's counsel, or person other than *amicus curiae*, its members, and its counsel made a monetary contribution to fund the preparation or submission of this brief. All parties have consented to the filing of this brief.

services that allow third-party creators to use these payment-processing systems.

## INTRODUCTION AND SUMMARY OF ARGUMENT

Since the appearance of the first digital app store fifteen years ago, consumers have become increasingly reliant on apps for the information, entertainment, and services they provide. Today, consumers can stay in touch with friends and family through communications and media-sharing apps, plan trips and commutes through airline and transit apps, buy a new television through online retail apps, entertain themselves with gaming apps, and even conduct financial transactions through banking apps. To facilitate these interactions between third-party apps and their customers, digital services provide app stores and websites that enable third-party creators to make their apps available to consumers. Because many of these third-party apps either require consumers to purchase the apps before download or permit consumers to make in-app purchases to further enhance their app experiences, digital services provide payment-processing systems as part of their app store's or website's overall infrastructure.

Despite Congress's clear mandate in Section 230 to protect digital services from being held liable as the publisher or speaker of third-party content, Plaintiffs here attempt to evade this protection by claiming that the digital services' provision of payment-processing systems transforms the allegedly illegal acts of third parties into the allegedly illegal acts of the digital services themselves. Not so. The payment-processing systems that digital services provide as part of their app store's or website's infrastructure are merely "tools meant to facilitate the communication and content of others"—in this case, between third-party apps and their consumers. *Dyroff v. Ultimate Software Grp.*, 934 F.3d 1093, 1098 (9th Cir. 2019). In providing these payment-processing systems, digital services do not endorse or otherwise adopt the content of third-party apps as their own, but instead engage in the choosing, curation, and display of content that are the hallmarks of "interactive computer services" that Section 230 protects.

The hole that Plaintiffs want to carve in Section 230 would force digital services into an impossible choice between independently monitoring millions of digital apps, and attempting to determine their legality under the varying laws of fifty different states and thousands of

local jurisdictions, or else giving up on providing most internet content. Even if it were possible for digital services to accurately and reliably monitor legal developments in every jurisdiction, as well as analyze the legality of millions of third-party apps, the sheer burden of doing so would make providing payment-processing systems impracticable. Given how integral these payment-processing systems have become to consumers' use of third-party apps, the loss of these systems' availability would be unduly disruptive to the aims of Section 230—"promot[ing] the continued development of the Internet" and "preserv[ing] the vibrant and competitive free market," 47 U.S.C. § 230(b)(1)-(2).

The district court's decision to deny Defendants Section 230 immunity therefore should be reversed.

## ARGUMENT

### I. As part of their overall display infrastructure, digital services provide payment-processing systems that third-party content creators and consumers use.

Software harnesses computing power to improve daily life in myriad ways. Consumers worldwide now have access to millions of

applications, from simple to complex,[2] and make billions of downloads to smartphones and other devices each day.[3]

Many of those downloads occur through app stores, which help bring a degree of organization to the vast digital marketplace. Digital services offer app stores as a way for content creators and consumers to find one another: if each app creator had to hawk its own product—from the digital equivalent of its own roadside stand—consumers would face an extraordinary challenge in finding the products they are looking for. App stores make that task manageable. Third-party app creators offer their products for download on these platforms. Consumers use app store platforms to search for, find, and download apps that they want to download and that are compatible with their device.[4] And because app

---

[2] Apple App Store, *The apps you love. From a place you can trust.*, https://www.apple.com/app-store/ ("[W]e offer nearly two million apps[.]"); Google Play, *How Google Play works* (June 2021), https://play.google.com/about/howplayworks/ ("[Google Play] provides 2 million apps & games to billions of people around the world ….").

[3] *The apps you love. From a place you can trust.*, *supra* n.2 ("More than 4B apps distributed each day …."); *How Google Play works*, *supra* n.2 ("140+ billion downloads on Google Play in the last year [as of May 2021]").

[4] Apple iOS, *Submit your iOS apps to the App Store*, https://developer.apple.com/ios/submit/ (explaining how creators can submit their apps "for

stores are marketplaces, not all apps are free. Third-party creators can choose whether consumers may download their apps for free, purchase the app for a one-time price, or buy a subscription.[5] Consumer spending on apps reflects the robust app economy.[6]

---

review" and "distribution"); Google Play Console Help, *Publish your app*, https://support.google.com/googleplay/android-developer/answer/98597 51 (explaining how creators can publish their app).

[5] Google Play Console Help, *Set up your app's prices*, https://support. google.com/googleplay/android-developer/answer/6334373; Apple App Store, *Choosing a business model*, https://developer.apple.com/app-store/ business-models/.

[6] *See* Apple Newsroom, *Apple services enrich peoples' lives throughout the year* (Jan. 10, 2022), https://www.apple.com/newsroom/2022/01/apple -services-enrich-peoples-lives-throughout-the-year/ (describing how "developers [have] s[old] digital goods and services earning more than $260 billion since the App Store launched in 2008"); Apple Newsroom, *Meeting pandemic challenges, Apple developers grow total billings and sales in the App Store ecosystem by 24 percent to $643 billion in 2020* (June 2, 2021), https://www.apple.com/newsroom/2021/06/apple-develope rs-grow-app-store-ecosystem-billings-and-sales-by-24-percent-in-2020/ ("announc[ing] that the App Store ecosystem facilitated $643 billion in billings and sales during 2020, a 24 percent year-over-year increase"); *How Google Play works*, *supra* n.2 (explaining that, as of June 2021, Google Play has "generat[ed] over $120 billion in earnings for developers"); *cf.* Mayumi Brewster, *Annual Retail Trade Survey Shows Impact of Online Shopping on Retail Sales During COVID-19 Pandemic*, U.S. Census Bureau (Apr. 27, 2022), https://www.census.gov/library/sto ries/2022/04/ecommerce-sales-surged-during-pandemic.html (describing how "e-commerce sales increased by $244.2 billion or 43% in 2020, … rising from $571.2 billion in 2019 to $815.4 billion in 2020").

Many apps offer "in-app purchases"—the ability to transact with the app creator while using the app. Many of these purchases allow customers to buy a premium level of service in the app itself—for example, removing the advertisements, unlocking bonus game levels, or buying game extras such as gems or magical swords.[7] These transactions are one way for the app creators to offer their basic product to everyone for free, but to offer paid upgrades to the most robust or dedicated users. The app, its premium levels, and the transactions that enable them are all part of the online digital offering.

Enabling these in-app purchases is an integral part of the infrastructure that app stores provide. Although the purchases themselves take place within the app, the digital services provide, as part of their overall app store and website infrastructure, payment-processing services that enable third-party creators to complete transactions, receive payments from app users, and activate or enable additional

---

[7] Apple Support, *Buy additional app features with in-app purchases and subscriptions*, https://support.apple.com/en-us/HT202023; Google Play Help, *Make in-app purchases in Android apps*, https://support.google.com/googleplay/answer/1061913; Facebook Help Center, *Making an in-game purchase on Facebook*, https://www.facebook.com/help/226504034029906/.

content that the payments cover.[8]  Given the sheer volume of transactions taking place in the digital app ecosystem, these payment-processing systems are absolutely necessary to consumers' interactions and experiences with these apps.  Offering these systems is covered by the immunity Congress conferred on "interactive computer [*i.e.*, digital] services," *see* 47 U.S.C. § 230, just as offering the app store itself is covered.

## II.    Section 230 immunity protects digital services' offering of payment-processing systems as part of their app store's or website's infrastructure.

The district court held that because Defendants include payment-processing systems in the digital services they provide, they can be held liable for the "processing of unlawful transactions for unlawful gambling."  ER-35 (*Custodero v. Apple Inc.*, No. 22-16914 (hereinafter, *Custodero*)) (emphasis omitted); 1-ER-34 (*Wilkinson v. Facebook, Inc.*, No. 22-16888 (hereinafter, *Wilkinson*)) (emphasis omitted); ER-34 (*Andrews v. Google LLC*, No. 22-16921 (hereinafter, *Andrew*)) (emphasis omitted).  What the court failed to recognize, however, is that Section 230 immunity covers digital services' offering of payment-processing

---

[8] *See* sources cited *supra* n.7.

infrastructures as part of the app-store function, which is squarely within what Section 230 protects: the organization and display of third-party content for the benefit of digital-service users. Plaintiffs seek to tie Defendants to the content of the third-party apps using the payment-processing infrastructure. But Defendants do not provide that content— third parties do. Treating Defendants as if they provided the content (here, online gaming) is exactly what Section 230 forbids.

### A. Plaintiffs' theory of liability seeks to hold digital services liable for the content of third-party apps using the app store's or website's infrastructure.

Plaintiffs seek to hold digital services liable for providing app stores through which digital services not only curate and display apps that third-party creators upload for consumers to download and consume, but also process in-app transactions. The district court correctly determined that Section 230 applies to most of this conduct, carving out only the payment-processing functionality as potentially falling outside Section 230's reach. But providing the functionality to process payments between apps and their users is part and parcel of the app stores' and websites' overall infrastructure. It falls squarely within Section 230's protection. Although the district court correctly concluded that Section

230 immunity extends to digital services' use of algorithms to organize third-party apps, ER-34 (*Custodero*); 1-ER-33 (*Wilkinson*); ER-33 (*Andrews*), the district court misconstrued this Court's precedent in holding that Section 230's protection did not extend to digital services providing payment-processing systems to third-party creators.

1. Section 230 "establish[ed] broad federal immunity to any cause of action that would make service providers liable for information originating with a third-party user of the service." *Perfect 10, Inc. v. CCBill LLC*, 488 F.3d 1102, 1118 (9th Cir. 2007) (quoting *Almeida v. Amazon.com, Inc.*, 456 F.3d 1316, 1321 (11th Cir. 2006)) (internal quotation marks omitted). Under Section 230, providers of "interactive computer service[s]" cannot be sued on a theory that seeks to hold them liable "as the publisher or speaker of any information provided by another information content provider." 47 U.S.C. § 230(c)(1); *see also HomeAway.com, Inc. v. City of Santa Monica*, 918 F.3d 676, 681 (9th Cir. 2019) (explaining that Section 230 immunity "extend[s] … to '(1) a provider or user of an interactive computer system (2) whom a plaintiff seeks to treat, under a state law cause of action, as a publisher or speaker (3) of information provided by another information content provider'"

(quoting *Barnes v. Yahoo!, Inc.*, 570 F.3d 1096, 1100-01 (9th Cir. 2009))). Generally, Section 230 "protects websites from liability for material posted on the website by someone else." *Doe v. Internet Brands, Inc.*, 824 F.3d 846, 850 (9th Cir. 2016).

As part of Section 230's "broad federal immunity," *Perfect 10*, 488 F.3d at 1118 (quoting *Almeida*, 456 F.3d at 1321) (internal quotation marks omitted), plaintiffs "cannot plead around Section 230 immunity by framing … website features as content," *Dyroff*, 934 F.3d at 1098 (Section 230 protected digital service's use of "features and functions, including algorithms," "emails[,] and push notifications"). Indeed, "what matters is not the name of the cause of action … [W]hat matters is whether the cause of action inherently requires the court to treat the defendant as the 'publisher or speaker' of content provided by another." *Barnes*, 570 F.3d at 1101-02. Accordingly, "publication involves reviewing, editing, and deciding whether to publish or to withdraw from publication third-party content." *Id.* at 1102. And "tools meant to facilitate the communication and content of others … are not content in and of themselves." *Dyroff*, 934 F.3d at 1098.

This Court has confirmed that Section 230 immunity extends to digital services that facilitate transactions, even when someone claims that the transactions are allegedly illegal because of the underlying third-party content passing through the defendant's digital infrastructure. For instance, one of the digital services in *Perfect 10* provided "webhosting and related Internet connectivity services" to several websites, while the other "allow[ed] consumers to use credit cards or checks to pay for subscriptions or memberships to e-commerce venues." 488 F.3d at 1108. Although the plaintiff there alleged that one of the digital services had only processed transactions for photographs that third parties posted online that allegedly infringed the plaintiff's copyright, *id.* at 1108, this Court held that Section 230's immunity extended to both of the digital services, *id.* at 1118-19.

Since *Perfect 10*, this Court has continued to treat Section 230 immunity as distinguishing between theories of liability that depend on the third-party content and those that do not. In *HomeAway*, 918 F.3d 676, the digital services operated websites that allowed third parties to post listings for vacation rentals that consumers could then book. *Id.* at 679 & n.1. This Court rejected the digital services' preemptive challenge

12

to a city ordinance largely prohibiting short-term vacation rentals because the ordinance only "prohibit[ed] processing transactions for unregistered properties" and "d[id] not require the [digital services] to review the content provided by the hosts of listings on their websites." *Id.* at 679, 682. Liability turned on whether a rental was registered with the city, and that fact did not turn on what the listing said. In relying on this distinction, this Court emphasized that Section 230 immunity *does* apply when the duty at issue "would necessarily require an internet company to monitor third-party content," *id.* at 682; it merely concluded that the particular city regulation created no such duty.

Likewise, this Court has made clear that Section 230 protection must be afforded to digital services unless they do more than "merely … augment[] the [third-party] content generally, [and instead] … materially contribut[e] to its alleged unlawfulness." *Fair Hous. Council of San Fernando Valley v. Roommates.com, LLC*, 521 F.3d 1157, 1167-68 (9th Cir. 2008). Roommates.com was not entitled to Section 230 immunity to the extent that it did more than "merely provide a framework that could be utilized for proper or improper purposes." *Id.* at 1172. Indeed, it "develop[ed] the discriminatory questions, discriminatory answers and

discriminatory search mechanism [that were] directly related to the alleged illegality of the site" and was ultimately "directly involved with developing and enforcing a system that subjects subscribers to allegedly discriminatory housing practices."[9] *Id.* But Section 230 immunity did protect Roommates.com as to allegedly discriminatory content included in the "Additional Comments" section of profile pages that were "essays … visible only to paying subscribers"—those sections were written entirely by third parties, and Roommates.com was "not responsible, in whole or in part, for the development of this content, which [came] entirely from subscribers." *Id.* at 1173-74. In reaching this conclusion, this Court emphasized that "[w]ithout reviewing every essay, Roommate[s.com] would have no way to distinguish unlawful

---

[9] This Court similarly concluded in a recent memorandum disposition that a digital service could be sued for allegedly discriminatory housing advertising practices because the digital service "contribute[d] materially to the alleged illegality of the conduct" by functioning as a "co-developer of content," specifically a tool that the plaintiffs alleged was itself "patently discriminatory," independent of any published third-party content. *Vargas v. Facebook, Inc.*, No. 21-16499, 2023 WL 4145434, at *2-3 (9th Cir. June 23, 2023) (quoting *Roommates.com*, 521 F.3d at 1168). Unlike the digital service in *Vargas*, Defendants here are nowhere alleged to be a "co-developer of content." *Id.* at *2. The digital service in *Vargas* has obtained an extension through August 7, 2023, to file a Petition for Panel Rehearing or Rehearing En Banc. No. 21-16499, ECF Nos. 77, 78.

discriminatory preferences from perfectly legitimate statements." *Id.* at 1174.

2. Plaintiffs here go much further than this Court's *Roommates.com* holding, however, in seeking to hold the digital services liable for allowing third-party apps to use the payment-processing systems available through the app store's or website's infrastructure. But these payment-processing systems are simply "tools meant to facilitate the communication and content" between the third-party creators and consumers of the third-party apps. *Dyroff*, 934 F.3d at 1098. In other words, the digital services provide an infrastructure—the app stores or websites—that facilitates communications between third-party creators and their consumers. *Roommates.com*, 521 F.3d at 1167. That this infrastructure also includes payment-processing systems changes nothing: many third-party apps offer in-app transactions to enhance consumers' experiences, *see supra* pp. 7-8, and payment-processing systems are just the tools that third-party creators and consumers can use to that end. In other words, what the consumer is purchasing in the app is often content—and the content comes from the third party, not from the app store that delivers it in exchange for the payment. Indeed,

when offering payment-processing systems for third-party creators' use, the digital services do not even endorse the third-party content involved. *See Roommates.com*, 521 F.3d at 1172 (website operator "could not be held liable for failing to detect and remove" defamatory content). There is no way to allow Plaintiffs to extricate payment functionality from the content that the payments enable. The two are inextricable from each other.

Accepting Plaintiffs' theory that digital services can be sued for third-party apps' use of their payment-processing systems in allegedly illegal transactions would necessarily require digital services to monitor the content of each and every third-party app. Digital services would no longer be able to serve as providers of "tools meant to facilitate the communication and content," *Dyroff*, 934 F.3d at 1098, but would instead have to independently review and determine the legality of all third-party content posted on their app store or website before allowing the third party to use their app store's or website's infrastructure, including payment-processing systems. This requirement "would necessarily require an internet company to monitor third-party content," *HomeAway*, 918 F.3d at 682, and "is precisely the kind of activity for which Congress

intended to grant absolution with the passage of section 230," *Roommates.com*, 521 F.3d at 1171-72 (referring to claim in earlier case that digital service "failed to review each user-created profile to ensure that it wasn't defamatory").

This case is not *Roommates.com*—nor is it *HomeAway*. In *HomeAway*, compliance with the local ordinance did not effectively require the digital service to monitor third-party content, but here, under Plaintiffs' theory, digital services *would* "necessarily" have to "monitor third-party content" to comply with Plaintiffs' proposed rule. *See* 918 F.3d at 682. They would have to scrutinize *all* the content delivered by each app in their app store following an in-app purchase to determine whether the payments were for getting the app to generate virtual magical swords (undisputedly lawful) or virtual casino tokens (allegedly unlawful). *See HomeAway*, 918 F.3d at 682; *see also supra* pp. 7-8. Likewise, unlike in *Roommates.com*, the digital services in this case have not developed in whole or in part any of the third-party apps at issue. Instead, they have "merely provide[d] a framework that could be"—and allegedly was—"utilized for proper or improper purposes" by the third-party creators. *Roommates.com*, 521 F.3d at 1167, 1172. The alleged

misuse of the digital services' payment infrastructure does not make the services complicit in the "improper purposes."

The district court noted that this case concerns the digital services' "sale of gambling chips," ER-35 (*Custodero*); 1-ER-34 (*Wilkinson*); ER-34 (*Andrews*), but at no point did the court suggest that these sales or transactions were processed through the digital services' app stores or websites in any special way or that the digital services contributed to the creation of these apps or facilitated these transactions in particular. Instead, these transactions were processed in the same manner that all third-party app transactions are processed—through the payment-processing systems available to all third-party apps posted on the digital services' app stores and websites. *See* ER-5 (*Custodero*); 1-ER-4 (*Wilkinson*); ER-4 (*Andrews*). And it should go without saying that the digital services' "mere creation" of app stores and websites that host third-party content "is not culpable." *Cf. Twitter, Inc. v. Taamneh*, 143 S. Ct. 1206, 1226 (2023) (explaining that "we generally do not think that internet or cell service providers incur culpability merely for providing their services to the public writ large," even if "bad actors" may use them "for illegal—and sometimes terrible—ends"). Indeed, ascribing third

parties' allegedly illegal conduct to digital services purely because the third parties used the app store's or website's infrastructure and payment-processing systems for their allegedly illegal conduct would be akin to holding that "internet or cell service providers incur culpability merely for providing their services to the public writ large." *See id.*; *Roommates.com*, 521 F.3d at 1172.

\*     \*     \*

This case "pushes the envelope of creative pleading in an effort to work around § 230." *Kimzey v. Yelp! Inc.*, 836 F.3d 1263, 1265 (9th Cir. 2016). Digital services neither create nor develop the third-party apps they host on their app stores and websites. That is no less true when those apps' third-party creators use the digital services' payment-processing systems to facilitate transactions. This Court should not permit parties to circumvent Section 230's broad federal immunity by attributing third-party content to the app stores or websites that merely facilitate communication between those third parties and their customers.

**B.    Imposing liability on digital services for offering payment-processing systems that some third parties use for improper purposes would make doing so prohibitively burdensome.**

Since the beginning of the internet, entrepreneurs have recognized that users will pay for content they value. They also know that they are more likely to earn a return on their creative effort if customers can find them in the marketplace. The digital infrastructure at issue in this case enables such creators to pass digital content to their consumers, and to receive the consumers' payments in return. Having the marketplace offer this service, rather than having to build a separate payment solution into each and every app, has freed content creators to focus on producing content that users want to buy. *See supra* pp. 7-8; *see also Perfect 10*, 488 F.3d at 1108, 1118-19 (concluding Section 230's immunity extended to digital service that "allow[ed] consumers to use credit cards or checks" to pay for content).

Excluding these payment-processing systems from Section 230's protection would threaten digital services' ability to offer these systems to everyone, not merely the third parties alleged to abuse these systems. Digital services are not courts and cannot determine on their own whether third-party content would be considered illegal in any of the

thousands of states and localities. *See Perfect 10*, 488 F.3d at 1119 n.5 (noting that variations in state laws mean "no litigant will know if he is entitled to immunity for a state claim until a court decides the legal issue"). Even if digital services could reliably detect illegal third-party content, imposing liability would still threaten many digital services' ability to offer payment-processing systems because of the sheer cost of monitoring and analyzing the legality of millions of third-party apps under myriad local laws. Given that laws change over time and by jurisdiction, digital services would risk litigation if even one third-party app slipped through the cracks in just one jurisdiction and would likely still face litigation based on whether they chose to provide or withhold payment-processing systems to or from a given third-party app. *Cf. id.* (noting that "[a]n entity otherwise entitled to § 230 immunity would … be forced to bear the costs of litigation under a wide variety of state statutes").

Moreover, Plaintiffs' theory runs contrary to the policy judgment, increasingly reflected in state legislation, that protecting consumers' privacy considerations requires minimizing the collection of their

personal data.[10]   Despite many states' attempts to ensure that the "collection, use, retention, and sharing of a consumer's personal information [are] reasonably necessary and proportionate to achieve the purposes for which the personal information was collected or processed," *e.g.*, Cal. Civ. Code § 1798.100(c) (2023), Plaintiffs would have every app store and website both track and store the age, credit card, and location information of any person playing a casino game in the app store's or website's online space.  This theory would not only increase the risk of digital services running afoul of states' laws and regulations and impose a burden on them that Section 230 prohibits, but it could also increase the collection, use, retention, and sharing of Plaintiffs' (and more broadly, consumers') personal data.

---

[10] *See, e.g.*, Cal. Civ. Code § 1798.100(c) (2023); Conn. Gen. Stat. § 42-520(a) (2023) (requiring controllers to "[l]imit the collection of personal data to what is adequate, relevant and reasonably necessary in relation to the purposes for which such data is processed"); Ind. Code § 24-15-4-1 (eff. Jan. 1, 2026) (similar); 2023 Mont. Laws ch. 681 § 7(1) (eff. Oct. 1, 2024); 2023 Or. Laws p. 8 § 5(1) (SB 619-B approved July 18, 2023) (eff. July 1, 2024); 2023 Tenn. Pub. Acts No. 408 § 47-18-3204(a) (eff. July 1, 2025); 2023 Tex. Gen. Laws ch. 541 § 541.101(a) (eff. July 1, 2024); Va. Code § 59.1-578(A)(1) (2023); *see also* Colo. Code Regs. § 904-3:6.07 (2023) (requiring controllers to "determine the minimum Personal Data that is necessary, adequate, or relevant for the express purpose or purposes").

Finally, Congress did not write Section 230 to shield only third-party content that is provided free of charge. *See* 47 U.S.C. § 230. As the U.S. economy has increasingly relied on the internet to conduct commercial transactions, payment-processing systems have become an integral part of digital applications and online transactions more generally. *See supra* pp. 2, 4-8. Forcing digital services to make this type of choice—between getting sued for third parties' use of their payment-processing systems and not providing payment-processing systems at all—would severely hamper the "preserv[ation] [of] the vibrant and competitive free market" and the "promot[ion] [of] the continued development of the Internet and other interactive computer services" that Congress enacted Section 230 to achieve. *See* 47 U.S.C. § 230(b)(1)-(2).

## CONCLUSION

The portion of the district court's decision denying Section 230 immunity should be reversed.

July 31, 2023                                    Respectfully submitted.

                                                 /s/ *William M. Jay*

Stephanie A. Joyce                               William M. Jay
Alexandra Sternburg                              Rohiniyurie Tashima
COMPUTER & COMMUNICATIONS                        GOODWIN PROCTER LLP
    INDUSTRY ASSOCIATION     1900 N Street, N.W.
25 Massachusetts Ave. N.W.,                      Washington, DC 20036
Suite 300C                                       wjay@goodwinlaw.com
Washington, DC 20001                             (202) 346-4000

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

### Form 8. Certificate of Compliance for Briefs

*Instructions for this form:* http://www.ca9.uscourts.gov/forms/form08instructions.pdf

**9th Cir. Case Number(s)** | Nos. 22-16921, 22-16923

I am the attorney or self-represented party.

**This brief contains** | 4,499 | **words,** including | 0 | words

manually counted in any visual images, and excluding the items exempted by FRAP

32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

○ complies with the word limit of Cir. R. 32-1.

○ is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

◉ is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

○ is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

○ complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:

☐ it is a joint brief submitted by separately represented parties.
☐ a party or parties are filing a single brief in response to multiple briefs.
☐ a party or parties are filing a single brief in response to a longer joint brief.

○ complies with the length limit designated by court order dated [       ].

○ is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** | /s/ William M. Jay | **Date** | 07/31/2023

*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at* forms@ca9.uscourts.gov

**Form 8** *Rev. 12/01/22*

## CERTIFICATE OF SERVICE

I, William M. Jay, hereby certify that on July 31, 2023, I electronically transmitted the foregoing document to the Clerk's Office using the CM/ECF System. I certify that all participants in this case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

/s/ *William M. Jay*
William M. Jay